Robert Louis **WILLIFORD**, Plaintiff,

v.

The **PEOPLE OF CALIFORNIA**, Robert A. Heinze, Warden, Folsom State Prison, and John Does, Defendants.

Civ. No. 8567.

United States District Court
N. D. California, N. D.
May 7, 1963.

---

Robert Louis Williford in pro. per.

Doris H. Maier, Asst. Atty. Gen., and Edsel W. Haws, Deputy Atty. Gen., Sacramento, Cal., for defendants.

HALBERT, District Judge.

On November 23, 1962, this Court ordered that plaintiff, Robert Louis X. Williford, be allowed to file, in forma pauperis, an action by which he alleged certain violations of his civil rights. Jurisdiction of this Court was predicated upon the Federal Civil Rights Act [Title 28 U.S.C. § 1343(3) and Title 42 U.S.C. § 1981 et seq.]. Since that time, plaintiff has established, and kept open, a running line of communications with the Court, seeking all manner of temporary relief. The case is now before the Court for determination of the State's motions to dismiss [Rule 12(b) of the Federal Rules of Civil Procedure] and for summary judgment [Rule 56 of said rules]. In support of said motions, the State sets forth the following contentions: (1) the complaint fails to state a claim for relief; (2) the federal questions presented by the complaint are frivolous, in light of the State's affidavits and exhibits; (3) plaintiff has presented no claim for money damages against any individual defendant; (4) no genuine issue as to any material fact is presented; and (5) the State's affidavits and exhibits establish the existence of certain controlling facts.

Plaintiff, a state prisoner presently incarcerated in the California State Prison at Folsom, claims to be a follower of the Islamic religion. By this allegation, he includes himself within the membership of that organization known as the Black Muslims. He contends that he has been systematically harassed in the exercise of his religion, and seeks, as balm for this alleged harassment, $100,000 general damages and $50,000 punitive damages. He also seeks to have the continuance of such alleged harassment enjoined.

Robert A. Heinze, Warden of Folsom Prison, has submitted an affidavit by which certain facts are asserted. The primary facts set forth in this affidavit can be summarized as follows:

1. The basic doctrine of the Muslims is set forth as a belief in the solidarity and supremacy of the dark-skinned races together with the militant doctrine that integration of white and dark-skinned races is contrary to the laws of God and nature. Plaintiff is a member of this group.

2. Within the confines of Folsom Prison, there exists a 138-cell Adjustment Center. This is a separate, three-story building. Inmates "who by their conduct and attitudes are unable to adjust to the routine within the general population in accordance with Rule D-4205" [Exhibit F, attached to the State's motion] are assigned to segregation status within the Adjustment Center, and are quartered on the top two floors.[1] These inmates receive all privileges accorded the general prison population, except that they may not view motion pictures which are shown in the main dining room. Inmates quartered on the first floor of the Adjustment Center are confined for violations of rules and regulations of the prison. These inmates are on isolation status. They are denied most of the privileges enjoyed by the general prison population. They are, however, allowed visiting rights, mail privileges, the right to smoke, and the right to exercise in the isolation yard. Out of approximately 65 Muslims within Folsom Prison, only 7 are presently assigned to the Adjustment Center. This assignment, moveover, is not, according to the Warden, related to the mere fact of the beliefs of these Muslims.

3. Plaintiff presently is on segregation status in the Adjustment Center. He has received institutional punishment of ten days' loss of exercise privileges for violating orders previously given him. He has also received institutional punishment on numerous occasions for violations of rules and regulations of the prison.

The State alleges that no discrimination, punishment or discipline has been meted out to plaintiff solely because of his religious beliefs. Plaintiff contests this allegation, apparently confusing the restriction of religious action and practice with a restriction of mere belief. One of the complaints made by plaintiff is that he has been denied the right to conduct Muslim religious services. Warden Heinze points out that although it is the policy of the California Department of Corrections to encourage religious worship and religious instruction within Folsom Prison, no inmates of any religion are permitted to conduct a religious service in the capacity of a minister. Moreover, no unsupervised groups, such as a group of Muslims attempting to participate in a Muslim service in the exercise yard, are permitted for any purpose.

It has been determined by the Department of Corrections that the Muslims are not entitled to be classified as a religious group. This determination was made for the purpose of administering the prison system in order to preserve the health, safety and welfare of the inmates thereof, and has been approved by the State Advisory Committee on Institutional Religion. The authority for such determination is to be found in California Penal Code §§ 5054 and 5058.[2] The reasons for the determination are set forth in defendants' Exhibit D [a copy of Administrative Bulletin No. 58/16 (First Revision) from the Department of Corrections, dated May 18, 1961] as follows: the Muslims deviate from true Islamic teachings by (1) the doctrine of the superiority of one race, (2) the doctrine of complete segregation of the races, (3) the doctrine that only members of a particular race may become Muslims, and, most important, (4) the basic aim and object to be carried out by preaching destruc-

1. Rule D-4205 provides as follows: "SEG-REGATION. Inmates shall be segregated from others when it becomes evident that they are a menace to themselves or others, or to property, or to the morale of the general population. Inmates may be segregated for medical, psychiatric, disciplinary or administrative reasons."

2. California Penal Code § 5054 provides that, "The supervision, management and control of the State prisons, and the responsibility for the care, custody, treatment, training, discipline and employment of persons confined therein are vested in the director [of the Department of Corrections]."

California Penal Code § 5058 provides that, "The director may prescribe rules and regulations for the administration of the prisons and may change them at his pleasure."

tion to the present world of white mankind.

As a consequence of the above determination, plaintiff and other Muslims are not permitted to assemble for the purpose of exercising and discussing the doctrines of their beliefs. Outside Muslim leaders are not permitted to meet with plaintiff or other Muslims in the prison for the purpose of conducting Muslim services. Newspapers and other media propounding the supremacy views of the Muslims are not permitted to plaintiff or any other inmate. Plaintiff is permitted the orthodox Holy Koran, which is recognized as the scriptures of the Mohammedan world. He is not, however, permitted to purchase or possess a version of any bible or other literature adapted by the Muslims to support their doctrine of the supremacy and solidarity of the dark-skinned races.

Plaintiff, by his response to the State's motions, has controverted several of the above allegations, each time by recitations of conclusionary language. He alleges discrimination against himself and other Muslims based solely upon the Muslim beliefs. He attempts to substantiate such allegations by setting forth instances of restrictions of his actions, as opposed to restrictions of his beliefs. He also points out that the general policy of the Department of Corrections to encourage religious worship and instruction is, by defendants' own allegations, withheld from the Muslims. Plaintiff contends that it is no duty or responsibility, or, indeed, any right, of defendants to pass judgment upon what they think constitutes a religion. Finally, he points out that the Holy Koran authorized by the Department of Corrections is not recognized by Muslim religious leaders.

In view of the contentions set forth by plaintiff, and notwithstanding the fact that they are almost entirely of a conclusionary nature, it is apparent that certain substantial issues of fact are raised in this action. For that reason, the State's motion for summary judgment, under the provisions of Rule 56, must be denied (See: United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176; Neff Instrument Corp. v. Cohn Electronics, Inc., 9 Cir., 269 F.2d 668; and Cox v. American Fidelity & Casualty Co., 9 Cir., 249 F.2d 616).

Within the above framework, the Court proceeds to consider the State's motion to dismiss. The crucial question in this case is whether plaintiff, and other inmates similarly situated, have a constitutional right to carry their beliefs into action by being afforded the right to conduct religious services within the prison. The State concedes that the Muslims are not accorded the status of a religion and are not allowed to practice their beliefs, whether or not said beliefs be religious. The State contends that such a requirement, that the Muslims be allowed to engage in the practice of their services, would be detrimental to the administration of the prison and would present a serious threat to the maintenance of order therein. Support for this contention is found in the Muslim beliefs themselves, which apparently prevent the Muslim from cooperating with prison officials and other inmates. The files of this very action indicate an intransigence on the part of plaintiff (and, in related cases, of other Muslims) toward procedures which have been determined to be necessary for the orderly process of the courts.[3]

The Muslim problem has been considered on a number of occasions by both

---

3. The Court notes, with reference to numerous of the papers filed by plaintiff, a flagrant refusal to comply with the verification requirements for documents submitted to the Court. For example, the following appears as a preface to several of plaintiff's documents:

"In the Name of Allah for the said reason hereinafter set forth; In this

United States District Court for the Northern District.

"In the Name of Allah comes now Robert Louis Williford, I am a Muslim I do not swear or affirm my word is bond and bond is life before I give my word I give my life."

state and federal courts.[4] Similar problems involving the relationship of other religious groups to prison inmates have also been considered.[5] No court has, however, considered this problem in the light in which it is now viewed by this Court.

Here in this jurisdiction, the very organization with which we are presently concerned was considered recently by the California Supreme Court in In re Ferguson, 55 Cal.2d 663, 12 Cal.Rptr. 753, 361 P.2d 417. Parenthetically, it might here be noted that the California Supreme Court is not known as an overly-conservative court. That Court unanimously held, however, that the Muslims had no constitutional right, either state or federal, by which they might compel the prison administration to allow them to practice their religious beliefs in prison. It is apparent that each of the complaints made in the present action was made by other inmates within the same Muslim organization, and under the same or similar conditions, in the Ferguson case.

The California Supreme Court, in its opinion in the Ferguson case, noted (55 Cal.2d at 670, 12 Cal.Rptr. at 756, 361 P.2d at 420) that,

"the Director determined that the principles petitioners allegedly espoused were in direct conflict with the health, safety, welfare and morals of the prison. * * * Petitioners, by their acts in rejecting the authority of members of the white race, displaying verbally and physically their hostility to the prison staff, interfering in the disciplinary proceedings of other inmates and the alleged doctrines advocated, present a problem in prison discipline and management."

In the present action, we are dealing with exactly the same determination as was upheld by the California Supreme Court. While that holding obviously is not binding upon this Court, this Court attaches great weight to it, and to the factors which led to the conclusions there reached.

■ There is no question but that the Muslims are entitled to the freedom of their beliefs, whether or not they be confined within a correctional institution (See: Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244; and In re Ferguson, supra; but cf. Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637). As the State points out, however, we are here concerned with the affirmative practice of those beliefs, rather than with the beliefs themselves.

■ It is a basic proposition of constitutional construction, in considering the guarantees of the First Amendment to the Constitution of the United States and the concepts therein set forth as applied to the states through the Fourteenth Amendment (See: Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed. 2d 601), that although freedom to believe and to adopt one's chosen form of religion is an absolute right, freedom of action in following one's concept of religion is subject to regulation for the protection of society (McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; Reynolds v. United States, supra; United States v. Mohammed, 7 Cir., 288 F.2d 236; Holdridge v. United States, 8 Cir., 282 F.2d 302; Mitchell v. Pilgrim Holiness Church Corp., 7 Cir., 210 F.2d 879; and Warren v. United States, 10 Cir., 177 F.2d 596). In determining the validity of legislation or other state action which is challenged

4. Pierce v. La Vallee, 2 Cir., 293 F.2d 233; Sewell v. Pegelow, 4 Cir., 291 F.2d 196; 4 Cir., 304 F.2d 670; Fulwood v. Clemmer, 111 U.S.App.D.C. 184, 295 F.2d 171; D.C., 206 F.Supp. 370; Brown v. McGinnis, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791; People ex rel. Wright v. Wilkins, 26 Misc.2d 1090, 210 N.Y.S.2d 309; In re Ferguson, 55 Cal. 2d 663, 12 Cal.Rptr. 753, 361 P.2d 417; and see In re Jones, 57 Cal.2d 860, 862, 22 Cal.Rptr. 478, 372 P.2d 310.

5. Kelly v. Dowd, 7 Cir., 140 F.2d 81; and McBride v. McCorkle, 44 N.J.Super. 468, 130 A.2d 881.

as violative of the free exercise of religion, two conflicting interests must be weighed. The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited. On the other hand, the state has an obvious interest in the preservation and protection of peace and good order within its borders, and particularly within its prisons. The courts are required to make accommodation between the constitutional guarantees as to religious freedom and the exercise of state authority. The most important interest will prevail.

Thus, state laws prohibiting the exercise of certain religious doctrines involving bigamy and polygamy have been upheld (Reynolds v. United States, supra; Davis v. Beason, supra; Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 478; and see Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12). A statute making it a crime for a girl under eighteen years of age to sell newspapers, periodicals or merchandise in public places has been upheld, despite the fact that the child, a member of the Jehovah's Witnesses faith, believed that it was her religious duty to perform this work (Prince v. Massachusetts, supra). Compulsory vaccination has been upheld, although the religious aspect of the problem appears to have been of minimal consideration (Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643). Compulsory military training as part of a state university curriculum has been considered not to violate the First Amendment freedoms (Hamilton v. Regents of University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343).

The United States Supreme Court appears recently to have established a varying test with reference to matters of religion, depending mainly upon whether the Court is concerned with the "establishment" clause or the "free exercise" clause of the First Amendment. While extreme vigilance appears to be the rule in connection with the "establishment" clause (See: Engel v. Vitale, supra), the recent Sunday Closing Law cases [6] indicate a much greater willingness on the part of the Court to defer to the wisdom of the states in matters involving the "free exercise" clause. The instant case appears to this Court clearly to fall within the application of the latter clause.

A certain paraphrasing of the Supreme Court's language in McGowan v. Maryland, supra, might be appropriate at this point:

"[W]e are asked to hold these statutes invalid on the ground that the State's power to regulate conduct in the public interest may only be executed in a way that does not unduly or unnecessarily infringe upon the religious provisions of the First Amendment. [Citing Cantwell vs. Connecticut, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213] However relevant this argument may be, we believe that the factual basis on which it rests is not supportable. * * * Obviously, a State is empowered to determine that (an alternate statute, not affecting the exercise of any religion) would not accomplish this purpose * * *. Furthermore, it seems plain that the problems involved in enforcing such a provision would be exceedingly more difficult than those in enforcing (the particular statute upheld, which more immediately affected particular religions than did a proposed alternative)."

Thus, it seems clear that at least one of the factors to be considered by the Court in passing upon the validity of a state statute or regulation affecting the free

6. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; Two Guys From Harrison-Allentown v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551; Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563; and Gallagher v. Crown Kosher Super Market, Inc., 366 U.S. 617, 81 S.Ct. 1122, 6 L. Ed.2d 536.

exercise of religion is the ease of enforcing such a statute or regulation in comparison with some other proposed regulation dealing with the same problem.[7]

Viewed in this perspective, the determination of the Department of Corrections appears to be substantially easier of enforcement (by disallowing all Muslim action in the prisons) than would be a piecemeal investigation of each individual circumstance of which complaint might be made by particular inmates.[8]

To the argument that the instant regulation is invalid on its face, for the reason that it refers to a particular religious group by name, it need only be noted that a similar situation was upheld by the Supreme Court in Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States, supra.

 Whether the State has the right to determine that the Muslim organization does not meet the requirements to classify as a religion, for purposes of allowing the practice of the Muslim rituals within the prisons, is a moot point. Even conceding, *arguendo*, that the State has no such right, this Court is of the opinion that the State does have the right to restrict or prohibit Muslim activities within the prisons, pursuant to its powers of control over those facilities. Thus, whether or not the Muslims have the right to be called members of a religious group, they have no constitutional right to practice that religion. As the United States Supreme Court stated in

Price v. Johnston, 334 U.S. 266, at 285, 68 S.Ct. 1049, at 1060, 92 L.Ed. 1356:

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."

The determination by the Department of Corrections that Muslim activities are a threat to peaceable and orderly behavior within the prisons gives rise to the authority of the State to regulate where the rights of the Muslims end and the duties of the prison administrators begin (See: West Virginia State Board of Education v. Barnette, 319 U.S. 624, 630, 63 S.Ct. 1178, 87 L.Ed. 1628).

Having reached the conclusion that the plaintiff's complaint fails to set forth any constitutional violation which would give rise to a cause of action under the Federal Civil Rights Act, the Court does not reach the further contentions raised by the State in its motion to dismiss.

IT IS, THEREFORE, ORDERED that defendants' motion to dismiss plaintiff's complaint, pursuant to the provisions of Rule 12(b) of the Federal Rules of Civil Procedure, be, and the same is, hereby granted;

AND IT IS FURTHER ORDERED that plaintiff's complaint, and the cause of action attempted to be set forth therein, be, and the same are, hereby dismissed. Defendants shall prepare a formal judgment in compliance with the applicable rules and statutes.

7. This Court assumes that the "ease of enforcement" criterion is only one of a number of considerations to be made in this substantive area, and that enforcement of a statute or regulation upon the sole basis of ease of enforcement, no matter how flagrantly such statute or regulation might violate all concepts of constitutional rights and freedoms, would be held improper.

8. As to this point, the Court is under no illusion that a requirement that separate investigations be made of each and every claimed deprivation of religious privileges of Muslims would lead to any situation but one of continual harassment of the prison authorities by the Muslims, with a consequent lessening of the efficiency of the prison officials in administering the prisons and dealing with the needs of the prison population as a whole.